## Grigsby, etc. v. Commonweath.

(Decided January 14, 1913.)

### Appeal from Perry Circuit Court.

1. Homicide—Conspiracy to Murder—Evidence—Verdict.—Appellants were indicted upon the charge of entering into a conspiracy to murder and with murdering Godsey. The Commonwealth failed to prove the conspiracy charged, but did show that appellants shot and killed Godsey, and under the evidence the jury was authorized to say that the killing was without reasonable excuse.

2. Homicide—Defense of Property—Instructions.—Appellants were not entitled to an instruction to the effect that if the Godseys tried to take their whiskey they had a right to shoot to prevent them from doing so, as it did not appear that they or either of them was in danger of losing their life or lives or of receiving great bodily harm.

3. Homicide—Joint Trial of Two Defendants—Instructions—Immaterial Error.—Upon a joint trial of two defendants, the court gave a set of instructions for each, but the name of the defendant in the second instruction of the first set should have been in the second instruction of the second set, and the name used in the second instruction of the second set should have been in the second instruction of the first set, but this was not such an error as would mislead the jury.

WOOTTON & MORGAN, H. C. FAULKNER, for appellants.

JAMES GARNETT, Attorney-General, D. O. MYATT, Assistant Attorney-General, IRA FIELDS, and E. E. HOGG, for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

The grand jury of Perry county returned an indictment against Wayne Grigsby, Monroe Grigsby and Boycan Noble, charging them with having entered into a conspiracy to and with murdering Austin Godsey. The Commonwealth failed to prove, on their trial, that there was any conspiracy, but did show that Wayne and Monroe Grigsby shot and killed Austin Godsey.

It seems from the proof that the three defendants had started to their uncle's who lived seven or eight miles away, on Troublesome creek; that they were going along a road near Comb's branch when they met Jim and Austin Godsey and Henry Brewer; that they all stopped and

talked awhile and the Grigsbys and Noble then started
on down the creek, and at just about the time they got
out of sight one of the Godseys or Brewer suggested that
perhaps the Grigsbys and Noble had some moonshine
and that they catch up with them and ask them for some
of it, as their whiskey was about all gone. They turned
around, caught up with the Grigsbys and Noble, who
had three or four quarts of whiskey, and asked them
for a drink and they gave it to them, and, after they all
drank and talked for a short time, the Grigsbys and
Noble again started down the creek. This thing occurred
four or five times and by the time the Godseys and
Brewer came up the last time they were pretty drunk—
Jim Godsey, in fact, was very drunk and when Grigsby
gave him a drink out of the bottle the last time, he put
it into his pocket and said he was going to keep it, and
Monroe Grigsby said to him that he ought not to do that
as he had been nice to them. There is no disagreement
as to what took place up to this time, but there is a vari-
ance in the testimony as to what occurred thereafter.
The testimony for appellants is to the effect that Jim
Godsey, just after putting the bottle into his pocket, told
his brother, Austin Godsey, to get Grigsby's saddle
pockets in which they carried their liquor, but the testi-
mony for the Commonwealth is that nothing of that kind
was said. The evidence is not very clear as to just what
did happen after Jim Godsey put the bottle into his
pocket, but it is plain that at about that time the Grigsbys
began to shoot Austin Godsey. It is also evident that
Wayne Grigsby fired first; that they each fired four or
five shots and that Monroe fired two shots at Jim Godsey
as he ran up the road. After the shooting, according to
the Commonwealth's testimony, they or one of them point-
ed a pistol at Brewer and told him to get on the horse be-
hind Boycan Noble and go along with them. They pro-
ceeded along the road, met one person but said nothing
to him about the killing. Soon thereafter they thought
about their pistols and concluded they had better and
did hide them in the woods, and later passed two or three
other persons, said nothing to either of them about the
killing, but asked one of them if he had any whiskey.
They continued their journey for seven or eight miles to
one Williams' where they remained all night, but did
not mention the killing while there. They returned the
next day and a deputy sheriff and two or three other
persons arrested them for the killing of Austin Godsey.

The deputy sheriff said that one of them asked him if Godsey was dead, and Richie, one of the persons along, said that Grigsby said that they did not kill Austin Godsey. Appellants denied that they forced Brewer to go with them after the shooting and stated that he went of his own accord. They admitted the hiding of their pistols and said they did it because they did not want the officers to find them armed when they were arrested as they knew they would be. They also admit that they did not speak of the killing. When Austin Godsey was found, he had a pistol in his hip pocket and a holster under his arm but there was no pistol in it, nor was there any, except the one mentioned, found about him. The Commonwealth explains the absence of the pistol from the holster by showing that he sold it to his brother Jim Godsey on the day of and before the killing and that Jim Godsey had it at the time of the killing. Appellants claim that Jim Godsey got the pistol off of the ground where Austin Godsey dropped it when they shot him. All agree, however, that Austin Godsey did not shoot, but appellants claim he tried to and would have if they had not shot him first, and the Commonwealth contends that he did not even have his pistol drawn. Jim Godsey was so drunk that he seems to have wandered around after the shooting. He waded across the creek three or four times and fired his pistol. He did not sober up until the next morning when a justice of the peace, who was investigating the killing, wakened him. We are of the opinion that under these facts the jury was authorized to say that the killing of Austin Godsey was without reasonable excuse.

Appellants claim that they were entitled to an instruction to the effect that if the Godseys tried to take their whiskey, they had a right to shoot to prevent them doing so. The giving of such an instruction would have been error, as it was not made to appear that the Godseys or either of them put one or both of the appellants in danger of losing their life or lives, or that they or either of them were about to render to appellants or one of them great bodily harm; and the court gave this theory of the case in strong language. At the time Jim Godsey put the bottle into his pocket, he was drunk and endeavoring, in a stupid way, to play a joke. Granting, however, that he was in earnest, appellants should have allowed him to keep the whiskey rather than to take his life to regain it. The court gave two sets of instructions, five in each

set.   The first set gave the jury the law of the case applicable to Wayne Grigsby, except the second instruction in which the name of Monroe Grigsby was used instead of Wayne Grigsby.   The second set was for the defendant Monroe Grigsby, with the exception of the second instruction and it used the name of Wayne Grigsby in place of Monroe Grigsby.

Each set of instructions was in the same language, showing that the interchange of names in the second instruction in each set was a mistake or oversight by the court or a mistake by the person who copied the instructions.   We are of the opinion, however, that it was not such an error as would mislead the jury, it matters not how it occurred.

For these reasons, the judgment of the lower court is affirmed.